REGAN, Judge.
Plaintiff, Robert L. Odom, a' machine operator, instituted this suit, in the form of an original and two supplemental petitions, against the defendant, International Harvester Company, endeavoring ■ to recover *748 workmen’s compensation at the rate of $30 per week for a period of four hundred weeks, subject to a credit of forty-three weeks, $1,000 for medical expenses, attorney’s fees, and penalties, for total permanent disability as a result of an injury, to his right shoulder, which he incurred on February 4, 1953, when he was drawing a pile of fiber, with a hook, weighing approximately one hundred and seventy pounds, from a machine to a scale, a distance of about twenty feet.
Defendant answered the original petition admitting the occurrence of the accident and that plaintiff had been paid compensation for forty-three weeks; it then asserted that compensation payments had been justifiably discontinued after December 10, 1953, since plaintiff arbitrarily refused to be hospitalized to undergo certain medical examinations to determine whether he was still suffering as a result of the accident and, if so, what further treatment should be administered.
Pending trial in the lower court, plaintiff filed a supplemental petition, which, in substance, related that he had been hospitalized by Dr. Jose J. Garcia-OUer who, after consulting with Dr. James T. Nix, advised plaintiff that an operation should be performed; subsequently, on January 25, 1954, a stellate ganglionectomy was performed by Dr. Nix and, as an effect thereof, plaintiff has developed a drop of the right eyelid and a small right pupil.
Defendant answered the supplemental petition generally denying the allegations thereof and further averred that if the plaintiff is totally and permanently disabled the disability did not result from the accident.
Plaintiff then filed a second supplemental petition in which he prayed for penalties.
Defendant, in response thereto, pleaded the exceptions of no right or cause of action; which were apparently overruled, and then answered generally denying the allegations thereof. >
From a judgment in favor of plaintiff awarding him compensation at the rate of $30 per week for a period not exceeding four hundred weeks, subject to a credit of forty-three weeks, and twenty percent attorney’s fees not exceeding the sum of $1,000, and an expert’s fee of $75 to Dr. Garcia, defendant has appealed.
The record reflects that on February 4, 1953, at about 11:45 p. m. or fifteen minutes before plaintiff was to have terminated his labor for the night, while engaged in pulling a pile of fiber, with a hook, weighing approximately one hundred and seventy pounds, from a machine upon which it was stacked, to a. scale about twenty feet removed, he experienced a very sharp pain in his right shoulder; however, he continued to work until midnight, using his left arm, and then informed one of the foremen that he had injured his shoulder; before leaving the plant his arm and hand began to swell and upon his arrival at home he was enduring considerable pain; the following day he consulted Dr. F. I. Nicolle, the defendant’s physician, who diagnosed and treated plaintiff’s injury as an “acute strain of the trapezius muscle right”; on February 17, 1953, Dr. Nicolle apparently became uncertain of the foregoing diagnosis and, therefore, referred plaintiff to Dr. Howard Karr for an examination and he subsequently confirmed Dr. Nicolle’s diagnosis. Plaintiff obtained no relief from Dr. Nicolle’s treatment and, on February 25, 1953, he consulted Dr. Blaise Salatich, who cared for him for a period of about two months or to April 22, 1953, when plaintiff, in desperation, again consulted Dr. Nicolle; on April 28, 1953, Dr. Nicolle hospitalized plaintiff in Touro Infirmary for examination; he remained there until May 2, 1953, at which time he was referred to Dr. Solomon Winokur for physiotherapy; plaintiff obtained some relief for a period of about eight days and then once again was afflicted with severe pain and swelling. On August 25, 1953, defendant, for the second time, hospitalized plaintiff in Touro Infirmary, and Dr. J. A. Colclough was engaged to perform a myelogram for the purpose of discovering if plaintiff was suffering from a fúptured' disc. The di *749 agnosis was negative and he was released from Touro on August 28, 1953, but shortly thereafter was hospitalized by the defendant, for the third time, in the Mercy Hospital where Dr. Colclough gave plaintiff several injections which provided only temporary relief. Upon plaintiff’s release from the hospital, he had, according to Dr. Nicolle, a “recurrence of all symptoms.” Dr. Colclough continued to treat plaintiff without success until September 28, 1953, when defendant requested him to enter Mercy Hospital for further examination and exploration. When Dr. Nicolle could not or would not advise plaintiff as to what the treatments would consist of, he refused, obviously because of fear, to enter the hospital. On October 9, 1953, plaintiff, on his own volition, consulted Dr. Jose J. Garcia Oiler, who diagnosed plaintiff’s ailment as “causalgia, * * * a condition in which the nerves supplying the blood vessels and the sweat glands to the affected extremities are abnormally active” and he related that in this instance “the stellate ganglia was the one acting abnormally.” On January 16, 1954, Dr. Garcia placed plaintiff in Mercy Hospital and gave him an injection of a chemical in the stellate ganglia, which afforded immediate relief. On January 19, 1954, when another injection thereof had the same effect, Dr. Garcia consulted with Dr. James T. Nix as to the advisability of an operation to remove the right stellate ganglia; the doctors being in accord the surgery was performed by Dr. Nix on January 25, 1954. Following the operation the excruciating pain which plaintiff had endured was terminated and he regained 90% of the function of his right arm, but the inevitable residual effects thereof was Horner’s Syndrome, which is a drooping of the right upper eyelid and decreased perspiration of the right side of the face. However, plaintiff’s left eyelid also drooped, which was unanticipated as an effect of the operation.
A careful analysis of the pleadings and the evidence, in our opinion, poses only a question of fact for our consideration and that is whether the plaintiff is totally and permanently disabled as a result of the accident which occurred on February 4, 1953?
The record, as is usual in cases of this sort, is embellished with much medical testimony. On behalf of the plaintiff only two physicians testified — Dr. Jose J. Garcia-Oller, who specializes in neurological surgery, and Dr. James T. Nix, a general surgeon. Defendant introduced into the record the testimony of five physicians— Dr. Hyman R. Soboloff, an orthopedic surgeon; Dr. Howard Karr, a neurological surgeon; Dr. Francis I. Nicolle, plant physician for the defendant; Dr. Shirley Rice Gaines and Dr. Julius Finkelstein, eye specialists.
In our opinion the record leaves no room for doubt that the plaintiff was injured on February 4, 1953, and, as a result of this injury, he was continuously under the care of a physician until January 25, 1954, when he was compelled to undergo major surgery by Dr. Nix, who elucidated thereupon as follows:
“My operation consisted of the removing of a nerve. It is called the stellate ganglia, which entwines about the blood vessel going to that arm. And dissecting that nerve from the blood vessel which is about the size of the thumb nail and removing it. During the operation it was sent to the pathologist that that was the nerve and it was verified.
* * * * * *
“I think that his arm has regained 90% percent of its function. I don’t think his arm will ever be normal. From the point of view that this gangli-onectomy — this ganglion, was put there or at least acts in that location to help the extremity control the responses of the blood vessels to temperature change and elevation; it does not have the nervous control any more, but he does not have the pain. So it is not as good as before. The typical thing with a causalgia like Syndrome is that the causalgia frequently returns. And when it returns it is much more difficult *750 to handle. Any unusual trauma will still bring about — any unusual trauma or strain of any great extent might precipitate a reoccurrence. It might and it might not. I think that his occupation should have some relief in the amount of heavy physical effort that he might be called upon to perform.
* * * * * *
“People with causalgia * * * their pain reaches such an intensity that they will beg you to cut off their arm. One thing that made me make a diagnosis originally as causalgia is when I first saw him he wanted me to cut off his arm. When somebody tells you that he gives you permission to cut off their right arm you know that they are in pain. This has to do with the other thing. I think, like Dr. Garcia, that the manifestation of the left eye is hysterical, and that is because of the great amount of pain he had. He was taking eight times the average dose of demerol to control the pain. What would knock me out he was taking eight times as much.”
Dr. Nix also expressed the opinion that plaintiff has a “Horner’s Syndrome” of the right eye, “that is a dropping of the right pupil, the right upper lid and there is a decreased perspiration of the right side of the face.” He asserted that this condition was permanent “I have never seen one recover complete use of the lid after a stellate ganglionectomy. That is the criteria of a successful operation.” With respect to the drooping of the left eyelid, Dr. Nix related that he had not observed the occurrence of this heretofore “but the disease itself as an entity is relatively recent and is not completely known. Just because I or no one else, has any explanation for it, does not mean it cannot happen.”
Dr. Nicolle and Dr. Karr expressed the opinion that causalgia was not a necessary aftermath or result of the injury, however, the record leaves no doubt in our minds from the date of the accident until the date of the operation plaintiff endured excruciating pain and that it was only after Dr. Nix performed the ganglionectomy that plaintiff was dramatically relieved of pain. Dr. Karr was of the further opinion that plaintiff was not suffering from a Horner’s Syndrome. In view of all of the other expert testimony we are frankly unable to understand how Dr. Karr justified the foregoing conclusion.
Dr. Soboloff, who saw plaintiff for the first time after the successful operation, testified that he “has some weakness of a minimal nature of the right upper extremity and that he should have some type of rehabilitation exercise * * * consisting of diathermy, massage and active exercise * * * if he regains the full strength of that arm, there would be no residual disability as far as the right upper extremity is concerned in doing the same type of work that he did prior to his injury.” Dr. Soboloff expressed no opinion relative to the Horner’s Syndrome.
Dr. Finkelstein asserted that though he could find no organic reason for it, plaintiff did have “a closed right eye” and “partially closed left eye.” He conceded that plaintiff had a ptosis (drooping) of the right upper lid and a contracted pupil of the right eye, which was the result of the operation.
Dr. Gaines related that plaintiff “had Horner’s Syndrome on the right side of the face and an error of refraction”, which was a necessary result of the sympathetic ganglionectomy. Dr. Gaines further stated that, though he could find no reason therefor, plaintiff’s left eyelid also drooped.
Henry J. Rolling, defendant’s employment supervisor, upon being interrogated “would you employ him in his present condition”, responded “No, sir, not with his eyes closed.”
We are convinced, as was the trial judge, that the expert medical testimony herein preponderates to the effect that plaintiff is totally and permanently disabled as a result of the accident which occurred on February 4, 1954.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.